UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

LIVN WORLDWIDE, LTD.,
a Mauritius limited company,

        Plaintiff,                              Case No. 9:23-cv-81515-DMM

v.

OLYMPUSAT HOLDINGS, INC., *et. al.*

        Defendants.
_____/

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT WITH INCORPORATED MEMORANDUM OF LAW**

Defendants, OLYMPUSAT HOLDINGS, INC. ("Olympusat Holdings"), a Florida corporation; OLYMPUSAT, LLC, a Florida limited liability company n/k/a OLYMPUSAT, INC., a Florida corporation ("Olympusat"); THOMAS MOHLER ("Mohler"), an individual; OCEAN NEW MEDIA, LLC, a Florida limited liability company ("Ocean"), (collectively, the "Olympusat Defendants"); TUBI INC., a Delaware corporation ("Tubi"); PLUTO, INC., a Delaware corporation ("Pluto"); CANELA MEDIA, INC. a Delaware corporation ("Canela"), (collectively "Defendants"), under Fed. R. Civ. P. 56 and S.D. Fla. L.R. 56.1, moves for summary judgment on counts I and II (direct, vicarious, and./or contributory infringement), and count III (breach of contract) of Plaintiff, LIVN WORLDWIDE, LTD ("LIVN")'s Second Amended Complaint filed on March 18, 2024. *See generally* Doc. 64, Second Am. Compl., at ¶¶ 69–94, and in support thereof, states as follows:

**I.    INTRODUCTION**

This is an attempt by Plaintiff to use copyright law to improperly expand the scope of the liability under the Parties' Licensing Agreements (as defined below). In doing so, Plaintiff seeks damages for alleged copyright infringement of the Licensed Series in territories *outside* the U.S. and outside the scope of the Licensing Agreements. In reality, this case stems from Plaintiff's retaliatory efforts against the Olympusat Defendants after an exchange of unpleasant emails between the two principals—Nadeem Sham and Tom Mohler—where Plaintiff attempted to offer

additional media content (aside from Licensed Series[1] subject to this lawsuit) to distribute on the Olympusat Defendants' FreeTV web player and mobile application. After this exchange of emails, Plaintiff began asserting claims that the Olympusat Defendants exploited and distributed the English and Spanish dubbed versions of the Licensed Series outside the licensed territories (e.g., India, United Kingdom, Europe, Africa, Australia, United States, and Latin America) violating the parties' license agreements and U.S. Copyright laws.

There are several problems with Plaintiff's copyright infringement claims. For starters, the Plaintiffs lack standing to initiate the copyright infringement claims and have not provided credible evidence to support that the Licensed Series was accessed outside the Licensed Territories. Specifically, Plaintiff submitted 129 videos that purportedly showed that the Licensed Series[2] was being accessed outside the licensed territories; however, Defendants' experts have since uncovered that these videos were likely modified to appear that the Licensed Series was accessed in unauthorized territories by using "geo-spoofing technology," as outlined by Defendants' expert reports.

Other than the video evidence submitted in discovery, there is an utter dearth of evidence is submitted to support Plaintiff's copyright infringement claims. By stark contrast, the Defendants have submitted evidence that it implemented geo-fencing technology to restrict users from accessing content outside the licensed territories before the Licensed Series aired on the Defendants' respective platforms in compliance with the parties' license agreements. Thus, given the record evidence, Plaintiff's copyright infringement claims fail as a matter of law.

Plaintiff also claims that the Defendants breached the licensed agreement by redistributing the English dubbed versions of the Licensed Series to third parties, including Tubi, Inc., Pluto Inc., and Canela Media, Inc., to display on their respective advertising video on demand (AVOD) or FAST channels on its streaming platforms. This is inaccurate. The plain and unambiguous language contained in the party's 2019 Agreement and 2021 Agreement contained a redistribution provision that allows the Olympusat Defendants to sublicense media content under the definition of "licensed networks," which gave the Olympusat Defendants the rights to redistribute the Licensed Series, including Spanish and English-dubbed and subtitled versions of Martial

---

[1] At all times material herein, the term "Licensed Series" refers to the fictional TV Series Shows titled "Martial Universe," "I Will Never Let You Go," "Nothing Gold Can Stay," "Legend of Hao Lan," and "The Wolf" as referenced in the Second Amended Complaint, Doc. 69 at ¶ 2.

Universe," "I Will Never Let You Go," "Nothing Gold Can Stay," "Legend of Hao Lan" and the English-dubbed version of "The Wolf" to third-parties. Given the language, the Olympusat Defendants rightfully redistributed to Tubi, Pluto, and Canela under the parties' 2019 Agreement and 2021 Agreement.

The undisputed facts show that the Olympusat Defendants have never distributed the Licensed Series outside the "licensed networks" definition under the parties' licensing agreements. Thus, Plaintiff's claim that the Olympusat Defendants breached the license agreements for redistributing content outside the licensed territories and redistributing the English-dubbed version of the Licensed Series fails as a matter of law. For the reasons articulated below, Defendants are entitled to summary judgment as a matter of law as to counts I–III of the Second Amended Complaint due to the Plaintiff's lack of standing and utter dearth of evidence in the record to support its copyright infringement and breach of contract claims.

## II. BACKGROUND[3]

Plaintiff is a film and television production company that also relicenses media content. *See* Sec. Am. Compl., Doc. 64 at ¶ 34; Ans. Affirm. Def., Doc. 69 at ¶ 9. Plaintiff also purportedly owns the exclusive rights to the subject Licensed Series in multiple countries. *See,* Doc. 64, Second Am. Compl. at ¶34. Plaintiff originally contracted with the Olympusat Defendants to distribute the Licensed Series on Olympusat's Free TV web-player and/or mobile application. *See* Sec. Am. Compl., Doc. 64 at ¶¶ 2–4; *see also* Ans. Affirm. Def., Doc. 69 at ¶ 30.

Thomas Mohler is the CEO of Olympusat Holdings, Inc., the corporate parent of Olympusat, LLC, f/k/a Olympusat, Inc., and Ocean New Media, LLC. (collectively "Olympusat"). Plaintiff entered into two licensing agreements, dated March 31, 2019 ("the 2019 Agreement") and October 5, 2021 ("the 2021 Agreement") (collectively "the Licensing Agreements") with Ocean New Media, LLC. *See* Sec. Am. Compl., Doc. 64 at ¶¶ 2–4; *see also* Ans. Affirm. Def., Doc. 69 at ¶¶ 13–31. The Licensing Agreements provided Ocean New Media, LLC, with the right to exploit the Licensed Series, including their English dubbed versions, in the licensed territory of the United States and its territories and possessions, Puerto Rico, Canada, and Latin America. Defendants also have sublicensing rights under the Licensing Agreements and have exercised

---

[3] The Statement of Material Facts will be filed simultaneously with the instant summary judgment motion in compliance with S.D. Fla. LR.56.1.

those rights by the terms of the Licensing Agreements. *See* Sec. Am. Compl., Doc. 64 at ¶¶ 2–4; *see also* Ans. Affirm. Def., Doc. 69 at ¶¶ 13–31.

Defendants have never authorized access to the Licensed Series under the Licensing Agreements for anywhere outside the licensed territories defined in the Licensing Agreements. Further, Defendants have not made their FreeTV app available in Australia, the UK, Ireland, India, and Mauritius territories. Not only have Defendants not made the FreeTV app available in those countries, but the content featured on the FreeTV app itself is geographically restricted to the territories for which content has been licensed to Olympusat under the Licensing Agreements.

On March 18, 2024, Plaintiff filed the operative Second Amended Complaint against the Defendants, alleging that the Defendants infringed on five (5) Television Series Shows titled "Martial Universe," "Nothing Gold Can Stay," "Legend of Hao Lan," and "I Will Never Let You Go." ("Licensed Series") *See generally,* Doc. 64, Compl. at ¶ 2; *see also* Doc. 69, Ans. at ¶ 2.

The Plaintiff alleges direct and contributory copyright infringement against the Defendants. Doc. 64, Compl. at ¶¶69–79. In counts I and II, Plaintiff alleges that the Olympusat Defendants infringed Plaintiff's rights by distributing, streaming, exhibiting, and dubbing the Licensed Series throughout the United Kingdom, Europe, Australia, and India without Plaintiff's authorization or consent. *Id.* Additionally, Plaintiff alleges that the Olympusat Defendants caused, enabled, facilitated, and materially contributed to that infringement by providing access to the masters of the Licensed Series, authorizing and facilitating the Infringing Uses, and continuing to do the same. *Id.* Finally, in count III, Plaintiff asserts that Ocean and Olympusat breached the 2019 Agreement and 2021 Agreement by failing to abide by the relevant terms. *Id.* at ¶¶89–94.

In the Answer, the Olympusat Defendants state that the Licensed Series was used in its FreeTV platform but all such uses were permitted under the 2019 Agreement and 2021 Agreement. *See* Ans. Affirm. Def., Doc. 69 at ¶69–88. Defendants deny that Plaintiff has the exclusive rights to initiate the instant copyright infringement action. *See* Ans. Affirm. Def., Doc. 69 at ¶30–31. Defendants deny infringing on Plaintiff's alleged copyright rights for the Licensed Series. Defendants also deny having profited from any alleged copyright infringement. *See* Ans. Affirm. Def., Doc. 69 at ¶69–88.

Further, Defendants assert six counterclaims for (1) breach of license, (2) tortious interference in connection with the Olympusat Defendants' relationship with its sublicenses to be tenuous due to LIVN's ongoing threats to terminate the Program Titles under the 2019 Agreement

and 2021 Agreement, (3) unjust enrichment, (4) breach of contract, (5) negligence, and (6) fraud in the inducement.   *See* Ans. Affirm. Def., Doc. 69 at ¶¶41–76.

### III. LEGAL STANDARD

Rule 56 requires entry of judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A factual dispute is "genuine …if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324.

In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that party. Anderson, 477 U.S. at 255; *see also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the court in evaluating summary judgment.  *Anderson*, 477 U.S. at 255. *See also Graham v. State Farm Mut. Ins. Co*., 193 F.3d 1274, 1282 (11th Cir. 1999). Summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

### IV. ARGUMENTS AND AUTHORITIES.

Defendants are entitled to summary judgment under counts I–III for several reasons.  First, Plaintiff lacks standing to establish its exclusive rights for copyright protection for the License Series because it has not properly authenticated the chain of title showing ownership of the Licensed Series.  Second, Plaintiff has failed to show that the Licensed Series are "foreign works" exempt from U.S. registration under the Copyright Act. Third, even if Plaintiff can show it has standing to assert copyright protection for the Licensed Series, the video evidence submitted to

purportedly show the Licensed Series was accessed outside the licensed territories via VPN is in derogation of the Defendants' terms of service and potentially fabricated based on Defendants' cloud-based and computer science engineer experts. Third, the uncontroverted evidence shows that Defendants incorporated geo-blocking technology to prohibit access to the Licensed Series to the unauthorized territories.  Finally, given the geo-blocking mechanism and plain and unambiguous language for redistribution rights of the License Series to third-parties, Plaintiff's breach of contract is without merit and fails as a matter of law.

    1.    **<u>Counts I and II: Copyright Infringement</u>.**

        i.    <u>The Chain of Title Documents Submitted for the Licensed Work Has Not Been Properly Authenticated and, Therefore, the Documents Are Insufficient to Establish Copyright Ownership.</u>

As an initial matter, Plaintiff has not provided credible evidence to support it owns the Licensed Series to establish standing to initiate the instant copyright infringement claims. Generally, the admissibility of foreign records is governed by Rule 44(a)(2) of the Federal Rules of Civil Procedure and Rule 902 of the Federal Evidence Code. While having an original foreign record offered into evidence is rare, it is far more common to have copies of the official records. In such a case, 902(4) must be read together with 902(3).  Under these rules, a foreign public record, or an officially filed or recorded document, may be proved with a copy accompanied by (a) a certificate made by "the custodian or other person authorized to make the certification" (FRE 902(4)); and (b) a "final certification" (FRE 902(3)) made by a diplomatic or consular officer.

The diplomatic or consular officer attests to the "genuineness of the signature and official position" of the first certifier. There is a chain of certificates, with a final certificate attesting to the signature and authority of those in the chain. They should state that the signature on the next certificate in the chain is genuine and that the signer of such prior certificate had the authority to certify the documents or was in a position to know whether such documents are genuine. The requirements for the final certification are the same as those imposed by FRE 902(3) for final certification of the originals of foreign records.

As for 902(12), the Court must determine whether records fall within the meaning of "regularly conducted activity." The original or a duplicate of a foreign record of regularly conducted activity that would be admissible under Rule 803(6) is self-authenticating if accompanied by a written declaration by its custodian or other qualified person certifying that the

record (a) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; (b) was kept in the course of the regularly conducted activity; and (c) was made by the regularly conducted activity as a regular practice. A party intending to offer a record into evidence under FRE 902(12) must provide written notice of that intention to adversaries and make the record and declaration available sufficiently to provide a fair opportunity to challenge them. Significantly, once the documents are authenticated, they would still be challenged for veracity.

Plaintiff submitted documents purportedly showing the chain of title for ownership of the Licensed Series. *See* Sham Dep. at 37:4–53:7. At deposition, the Plaintiff's Corporate Representative, Nadeem Sham, admitted that he did not know whether a diplomatic or consular officer made the signatories of the purported certifications for the chain of title documents to authenticate the documents properly. *See* Sham Dep. at 44:37–52:25 (attesting that the chain of title documents was certified by a business entity's representative – not a diplomatic or consular officer).

Further, Plaintiff failed to provide a written declaration by a custodian or other qualified persons certifying that the chain of title documents were made at the time of execution, kept in the courts of regular business, and made by the regularly conducted activity as a regular practice. *See* FRE 902(12).  Finally, Plaintiff failed to submit a written notice of its intention to make the record and declaration available to provide a fair opportunity to challenge the documents. *Id.*  Based on the lack of authenticating evidence for the chain of title documents supporting ownership of the Licensed Series, Plaintiff has not provided credible evidence[4] to support that it owns the exclusive rights to Licensed Work to initiate a copyright infringement claim.  As such, Defendants are entitled to summary judgment as to counts I and II for Plaintiff's lack of standing to assert its copyright infringement claims on this basis alone.

> ii. <u>Plaintiff Lacks Standing to Assert Copyright Infringement Claims Because it Failed to Show The Licensed Series is Qualified Under the Foreign Works Exception Under § 411 (a).</u>

---

[4] Plaintiff recently submitted certificates of registration for "Martial Universe – Episode 1," "I Will Never Let You Go – Episode 1," "The Legend of Hao Lan, Episode 1," and "Nothing Gold Can Stay," showing that the certificate of registrations for these titles was registered with the Copyright Office on August 7, 2024.  However, the alleged infringement pre-dates the Plaintiffs' Copyright infringement and does not show how the publication of the Licensed Series were first distributed in China or abroad.

As an additional reason for lack of standing, Plaintiff alleges that it is the exclusive licensee of the License Series and claims protection under the Berne Convention. *See* Sec. Am. Compl, at ¶1, ¶51–52.  However, Plaintiff has not established an ownership interest or copyright protection because it has failed to show that the Licensed Series is a "foreign work" exempt from copyright registration under U.S. Copyright law. Before initiating a copyright infringement case, the copyright owner must register its copyrighted work before initiating a suit. *See* 17 U.S.C. § 411(a); *Fourth Estate Public Benefit Corp. v. Wall-Street.com*, 139 S. Ct. 881, 885 (2019).

For purposes of 17 U.S.C.S. § 411, the Copyright Act defines a "United States work" as a work that: (1) in the case of a published work, the work is first published – (A) in the United States; (B) simultaneously in the United States and another treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States; (C) simultaneously in the United States and a foreign nation that is not a treaty party; or (D) in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of an audiovisual work legal entities with headquarters in, the United States; (2) in the case of an unpublished work, all the authors of the work are nationals, domiciliaries, or habitual residents of the United States, or, in the case of an unpublished audiovisual work, all the authors are legal entities with headquarters in the United States; or (3) in the case of a pictorial, graphic, or sculptural work incorporated in a building or structure, the building or structure is located in the United States. 17 U.S.C.S. § 101.

The Eleventh Circuit has also recognized that a plaintiff who claims his published work is exempt from the registration requirement must prove that the first publication occurred abroad. *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1304-05 (11th Cir. 2012) See 17 U.S.C. §§ 101, 411(a); (citations omitted). This requires the plaintiff first to prove a publication: that the method, extent, and purpose of the distribution meets the Copyright Act's requirements for publication. *Id*. at 1304-05.  Once the plaintiff has proven publication, he must prove that the publication was, in fact, the first publication and that the geographic extent of this first publication diverges from the statutory definition of a "United States work."  *Id*. at 1304-05.  Thus, the issue turns to "publication" for the work.

Thus, to proceed with a copyright infringement action, a plaintiff who claims his published work is exempt from the registration requirement must prove that the first publication occurred abroad. *See* 17 U.S.C. §§ 101, 411(a); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1233 (11th

8

Cir. 2010); *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1142 (11th Cir. 2007). This requires the plaintiff first to prove a publication: that the method, extent, and purpose of the distribution meets the Copyright Act's requirements for publication. Once the plaintiff has proven publication, he must prove that the publication was, in fact, the first publication and that the geographic extent of this first publication diverges from the statutory definition of a "United States work."

Applying the authorities above, Plaintiff alleges that it is the exclusive license of the Licensed Series; the Licensed Series stars Chinese actors; the television series are produced in the Chinese language. However, this does not make the Series a foreign work. Works published simultaneously in the United States and another treaty party are considered "United States works" for registration purposes. *See* 17 U.S.C. § 104(b); *id.* at § 101 (definition of "United States work"). The plaintiff's corporate witness admitted that the series first aired on Dragon TV, a Chinese-language channel that distributes content in the United States, at the same time. *See* Sham Dep. at 62:14–25.

Despite this issue being subject to the Fed. R. Civ. P. 30(b)(6) deposition notice, Plaintiff has never been able to provide any evidence indicating that its predecessor, at the time of the first offer to distribute the show in general, did not offer it to a U.S. distributor or broadcaster for further distribution to the public. *See* 17 U.S.C. § 101 ("offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication."). Accordingly, Plaintiff's failure to properly register the Series with the U.S. Copyright Office requires dismissal for lack of standing. See *Fourth Estate*, *supra*, at 885.

Arguably, Martial Universe qualifies as a "United States Work" because, according to public sources, the program was published in China on August 7, 2018, and Amazon's U.S. site shows a release date of August 6, 2018 (which, depending on the hour, would be August 7, 2018 in China). Thus, the Licensed Series is considered a "United States Work" because, although it was created outside the US, the publication on China's Dragon TV and US's Dragon TV constituted simultaneous publication in China and the US. LIVN asserts that Martial Universe was first published in 2017 on China's Dragon TV. However, the uncontroverted evidence shows that Martial Universe was published in China in 2017, and the plaintiff is burdened to prove the works were published in China. In addition, Plaintiff only obtained exclusive licensing rights for Martial Universe in March 2019, so LIVN would not necessarily know when the publication was made.

9

Similarly, according to IMDB, the other Program Titles, "I Will Never Let You Go," "Nothing Gold Can Stay," "Legend of Hao Lan," and "The Wolf," were published on China's online platforms: iQiyi, Tencent Video, Youku, and ZJTV.  However, based on public sources, these Program Titles appear to have been published on MZTZ's YouTube channel on or around the same day the publication airs dates on China's online platform, as noted below:

| Title | IMDB/Wikipedia Air Date | YouTube's "大劇獨播 MZTV" channel |
|---|---|---|
| "I Will Never Let You Go." | January 8, 2019 | January 8, 2019[5] |
| "Legend of Hao Lan" | January 19, 2019 | January 19, 2019[6] |
| "Nothing Gold Can Stay" | August 30, 2017 | December 22, 2018[7] |
| "The Wolf" | November 19, 2020 (depending on the hour, it would be November 20, 2020, in China) | November 20, 2020[8] |

Based on the public sources identified above, the Licensed Series was distributed in the U.S. on the same day as in China via iQiyi, Tencent Video, Youku, and ZJTV.  Further, Plaintiff has failed to provide documents or testimony that "I Will Never Let You Go," "Nothing Gold Can Stay," "Legend of Hao Lan," and "The Wolf," were published in China.  Because Plaintiff has failed to establish that the Licensed Series is excused from Registration Requirement, Plaintiff lacks standing to Sue for Copyright Infringement.  *See Latimer*, 601 F.3d at 1233; *BUC Int'l Corp.*, 489 F.3d at 1142.  As such, Defendants are entitled to summary judgment as to counts I and II for

      A.      **There is No Credible Evidence to Support Plaintiff's Copyright Infringement Claims.**

In support of its copyright infringement claims, Plaintiff submitted 129 videos purportedly supporting Plaintiff's claim that Defendants distributed the Licensed Series outside the Licensed Territories in violation of the 2019 Agreement and 2021 Agreement. Each video shows a user navigating to FreeTV and WhatIsMyIPAddress.com to "verify" the user's IP address using the

---

[5] https://www.youtube.com/watch?v=ow8XVtbzQaU&list=PLkvG4EWPDB0n-gaWI5qQpB5jKrPpuAicy

[6] https://www.youtube.com/watch?v=kCsW_im_Bvw&list=PLkvG4EWPDB0nbB_lOdRikU7ybYyGNhnTi

[7] https://www.youtube.com/watch?v=kZQmrTovrSw

[8] https://www.youtube.com/watch?v=EUMKLrhBg20&list=PLpghCOjR4QqrKjwKw-jkbWAbH6g08q1SR

website's "MY IP" functionality. That website claims to service 'millions of IT professionals, computer users, and international travelers" to retrieve information about IP addresses for a local device. It allows you to look up information about other IP addresses, provided you have an IP address to look up.

### i. Geo-Blocking Technology was Implemented Before Airing the Licensed Series on Defendants' Platforms.

After reviewing the videos, Defendants' cloud-based forensic expert, Corey Gildart, opined that FreeTV's geo-blocking features were integrated pre-launch on January 27, 2020, and have been continually updated, maintained, and operated since tested in October 2024. *See* Exhibit 3, Gildart Decl. at ¶8. Gildart also opined that none of the 87 LIVN recordings serve as uncontroverted evidence that FreeTV lacked geo-blocking features for episodes from the titles subject to the matter. *Id.* at ¶7–9. At deposition, the Corporate Representative(s) for Olympusat and Ocean, Pluto, Tubi, and Canela testified that geo-blocking mechanisms were in place before airing, distributing, or publishing the Licensed Series on their respective platforms under the 2019 Agreement and 2021 Agreement. *See* Exhibit 2, Glynn Dep. at 56:3–9. Thus, the uncontroverted evidence supports that the Defendants had mechanisms to restrict the Licensed Series from distribution outside the Licensed Series. The Defendants have integrated, updated, maintained, and operated geo-blocking features for their respective platforms from launch to the present.

### ii. Defendants' Experts have alleged that Plaintiff's video recordings are inconsistent and, therefore, cast serious doubt About their authenticity.

On the other hand, Defendants' experts have opined that the evidence submitted may have been accessed using VPN split-tunneling or another proxy server to mask the IP address to show that the License Territories were accessed in different countries. *See* Exhibit 3, Gildart Decl. at ¶10. At deposition, and in Plaintiffs' answers to interrogatories, Sham, on behalf of the Plaintiff, stated that the video recordings[9] were a) created by himself, Kapil Bisht, or Apoorva Verma; b) that Verma and Bisht work in India; c) the Licensed Series were accessed using a VPN unless the

---

[9] On November 26, 2024, Plaintiff submitted virtually identical Declarations of Apporva Verma and Kapil Bisht – past the parties' court-ordered discovery deadline on November 25, 2024 – stating that they accessed the Licensed Series using a VPN program called "Windscribe" to check the accessibility of the shows at issue on FreeTV in other countries. Noticeably, however, the Declaration(s) were not apostilled in India, not certified by the Hague Convention's "Apostille," notarized by a notary public in the US, or notarized by the U.S. Embassy or Consulate. Thus, Defendants are moving to strike these affidavits based on the untimeliness and authenticity of the documents.

user was located in India or the UK; d) and, all countries allegedly outside the Licensed Territories were confirmed using Google Date-Time search. *See* Exhibit 1, Sham Dep. at 141:23–198:9.

After reviewing the forensic and metadata provided in the video links, Defendants' experts opined that Plaintiff's video recordings appear to have been manufactured or edited to show that the Licensed Territories were accessed outside the Territories. *See* Exhibit 3, Gildart Decl. at ¶12–20. To be sure, Defendants' Cloud Forensic expert, Corey Gildart, opined that the user in each of the video recordings shows that the user in the recordings had access to and was using Virtual Private Network technology or proxy IP addresses via an ISPs' data center while recording to access the FreeTV platform from July 17, 2023 and August 9, 2023. *See* Exhibit 3, Gildart Decl. at ¶8. Gildart found that the video recordings do not bear the imprimatur of forensically sound evidence, particularly as the videos are inconsistent and unaccompanied by details to replace the approach in both time and process. *See* Exhibit 3, Gildart Decl. at ¶10. He also found no forensically preserved metadata or affirmations accompanying the video recordings that could help corroborate or validate the process and/or result. *See* Exhibit 3, Gildart Decl. at ¶11.

Further, the Defendants' software engineer expert, Jason Frankovitz, reviewed 29 video recordings[10]. The 29 videos reviewed were captured as a "screencast," where the contents of the computer screen were written directly into a movie file on the same computer. Other video recordings included a physical camera pointed at a camera screen after someone pushed the record button. Frankovitz found that the video recordings are missing GPS metadata, server logs, and network traffic logs typically found when analyzing what a network was doing. In addition, Frankovitz found creator metadata showing the videos were edited using Adobe Premiere Software. Thus, Frankovitz found that the presence of the metadata suggests that some of the videos have been edited, which casts doubt on the authenticity of the videos

Based on the Defendants' expert opinion, the Plaintiff's video evidence may have been edited to show that the Licensed Series was accessed outside the territories to support the Plaintiff's copyright infringement and breach of contract claims. This is not proper. Thus, given the Defendants' expert opinion and forensic evidence, the Plaintiff's video evidence is unreliable and unauthentic.

        iii.    Accessing the Licensed Series using a VPN violates Olympusat, Tubi, Pluto, and Canela's Terms of Service Agreement.

---

[10] Defendants will supplement the information with Frankovitz's deposition transcript upon receipt of the same.

A Virtual Private Network creates a secure digital connection between a local computer and a remote server, typically owned and operated by the VPN service provider. Once established, the data sent from the computer to the server is encrypted in transit, and the IP address of the computer's user is marked   The intended purpose of using a PPN is for personal data protection. A secondary capability of utilizing a VPN is intentionally circumventing geographic restrictions imposed by internet content providers  Using intermediary technology like a VPN may be illegal depending on the jurisdiction.

Regardless, using a VPN to circumvent geographic locations directly violates a content provider's terms of service. The Olympusat Defendants, Tubi, Pluto, and Canela's terms of service(s) state that using VPN to access the licensed content is prohibited. Specifically, Section 3.1 of FreeTV's Terms of Service titled "Geographic Limitation," states, in part, as follows:

> Geographic Limitation. FREETV is available and operated in the United States of America, Latin America and the Caribbean (herein after collectively referred to as the "Territory(s)" or individually as a "Territory" if referring to individual areas such as (i) Latin America, (ii) the United States of America, and (iii) Caribbean). Countries in Latin America include: Argentina, Bolivia, Chile, Colombia, Costa Rica, Ecuador, Guatemala, Honduras, Mexico, Nicaragua, Panama, Paraguay, Peru, Salvador, Uruguay, and Venezuela. The United States shall be defined as the United States, Puerto Rico and the U.S. Virgin Islands. The Caribbean shall include the Dominican Republic. FREETV may be available and operated in other countries and this TOU will be updated accordingly. The Content in each Territory may vary due to rights and licenses. FREETV makes no representations that all Content is or will be available across all Territories. We may restrict access to FREETV in its entirety or partially with respect to certain Content from other countries or locations outside the Territory in our sole discretion. ***You represent and warrant that you are in a location where FREETV has been made available and will not attempt to access the Services from any other location or through VPN and/or proxy servers located in any other location***. We may use technologies to verify your geographic location and will block access to the Services based on our good faith determination that you are outside the Territory. Any unauthorized access outside the Territory could result in a termination of your access to the Services.

*See* https://video.freetv.com/terms (last accessed: November 25, 2024)(emphasis added)).

*    *    *    *

Section 2 of Tubi's Terms of Service titled "Access and Use of the Tubi Services and Content" states, in part, as follows:

> The Content. The Content is available for permissible viewing on or through the Tubi Services.
>
> You may only access and view the Content personally and for non-commercial purposes in compliance with these Terms of Use. ***You may not either directly or through the use of any device, software, internet site, web-based service, or other means remove, alter, bypass, avoid, interfere with, or circumvent any copyright, trademark, or other proprietary notices marked on the Content, Tubi Services or any digital rights management mechanism, device, or other content protection or access control measure associated with the Tubi Services or the Content, including geo-filtering mechanisms***. You may not use technologies to access or use the Tubi Services or Content from or within territories where Tubi does not have rights nor offers the Tubi Services.

*See* https://tubitv.com/static/terms (last accessed: November 25, 2024) (emphasis added)).

*    *    *    *

Section 5.3 of Pluto TV's Terms of Service titled "Intellectual Property; License" states, in pertinent part, as follows:

> 5.3. Without limiting the foregoing, ***you may not modify, interfere with, enhance, remove or otherwise alter in any way***: (a) any portion of any video player ("Video Player") made available within the Services; (b) any of the applicable Video Player's underlying technology; or (c) any digital rights management mechanism, device or other content protection or access control measure incorporated into the applicable Video Player. ***This restriction includes, without limitation, disabling, modifying, reverse engineering, interfering with or otherwise circumventing the applicable Video Player in any manner.***

*See* https://legal.paramount.com/us/en/plutotv/terms-of-use (last accessed: November 25, 2024) (emphasis added)).

\*       \*       \*       \*

Section 3 of Canela's Terms of Service titled, " Representation and Warranties states, in pertinent part, as follows:

> You agree not to engage in any of the following prohibited activities, among others: …(viii) infringing upon or violate our intellectual property rights or the intellectual property rights of others; (ix) …(xi) *interfering with or any activity that threatens the performance, security or proper functioning of the Services;* …(xiv) *bypassing the security features or measures we may use to prevent or restrict access to the Services, including without limitation features that prevent or restrict use or copying of any content or enforce limitations on use of the Services or the content therein;* (xv) attempting to access unauthorized Accounts or to collect or track the personal information of others; (xvi) using the Services for any purpose or in any manner that infringes the rights of any third party; or (xvii) encouraging or enabling any other individual to do any of the foregoing.

*See* https://canela.tv/terms (last accessed: November 25, 2024) (emphasis added)). Because a VPN and/or proxy server was used to access the Licensed Series to purportedly show that the content was viewed outside the licensed territories in Plaintiff's video recordings, Plaintiff violated FreeTV, Pluto, Tubi, and Canela's terms of service agreements.

### B. There is No Evidence of Contributory And/or Vicarious Copyright Infringement Claims to Support Against the Defendants Because Plaintiff Failed to Prove Direct Infringement.

#### i. Defendants Are Not Liable Under The Theory of Contributory Liability

The Eleventh Circuit has stated that a contributory infringer is "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Cable/Home Communication Corp*., 902 F.2d at 845 (citing C*asella v. Morris,* 820 F.2d 362, 365 (11th Cir. 1987)); *see also Sony Corp v. Universal City*, 464 U.S. 417, 437, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984) (recognizing that the Supreme Court has defined a contributory infringer as one who "was in a position to control the use of copyrighted works by others and had authorized the use without permission from the copyright owner."). Furthermore, the Eleventh Circuit has stated that "[t]he standard of knowledge is objective: 'Know, or have reason to know.'"

*Casella*, 820 F.2d at 365 (quoting *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)).

There is no proof of direct copyright infringement; thus, Plaintiff's contributory copyright infringement fails for this reason alone. Despite this, turning to the record evidence, the Defendants neither knew nor should have known that the Licensed Series was accessed outside the licensed territories because they implemented geofencing technology to restrict the content from being published in these locations. *See* Exhibit 2, Glynn Dep. at 56:3–9; Exhibit 3, Gildart Decl. at ¶8; Exhibit 4, Mohler Dep. at ¶¶ 7–8; Exhibit 5, at Arenas Decl. at ¶¶ 9–10.  Each of the Defendants' Corporate Representatives for Tubi, Canela, Pluto, and Olympusat testified that they had no reason to believe that the license agreements did not provide them with the rights to use the Licensed Series.  *See* Exhibit 5, Kuessener Dep. at 18:8–17; Exhibit 6, Tzou Dep. at 17:16–18:16; Exhibit 7, Rafferty Dep. at 36:16-22(attesting that the Licensed Series was used per the parties' licensing agreements). Accordingly, Defendants did nothing to induce, cause, or materially contribute to the infringing conduct because they had proper license agreements giving the rights to use the License Series on their respective platforms.

Thus, Defendants are entitled to a judgment of law in its favor as to Plaintiff's contributory copyright infringement claim asserted in count II.

       ii. <u>Defendants Are Not Liable Under the Theory of Vicarious Liability</u>

Vicarious infringement occurs "when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005).  Here, The record evidence is missing *how* the Defendants' free service to FreeTV, Pluto, Canela, or Tubi's app and web player provides a financial benefit directly caused by Defendants' alleged copyright infringement. The users have a free account for FreeTV, Pluto, Canela, or Tubi's app and web player, regardless of whether they have accessed the Licensed Series. The Defendants obtain a financial benefit from advertisements displayed on the program titles.

Simply put, a free account to Defendants' online streaming services would not constitute a direct financial interest such that gross profits would be available given the facts of this case. Plaintiff has not *alleged* a direct financial benefit from distributing the program titles and a user's decision to sign up for a free account to access FreeTV, Pluto, Canela, or Tubi's app or web player. *Coach, Inc. v. Hubert Keller, Inc.,* 911 F. Supp. 2d 1303, 1309 (S.D. Ga. 2012) (holding that

16

plaintiff's motion to compel production of the flea market's tax returns and other financial information was denied on relevancy grounds under Fed. R. Civ. P. 26 because such information would not prove ill-gotten profits damages under 17 U.S.C.S. § 504). Plaintiffs must prove a causal connection between the infringement and the profits claimed—which they failed to do here. Thus, Defendants are entitled to judgment as a matter of law as to Plaintiff's vicarious copyright infringement claims under count II.

    **2.**    <u>**Counts III – Breach of Contract**</u>.

        **A.**    **The 2019 and 2021 Licensing Agreements Contain Plain and Unambiguous Language for the Defendants' Rights to Distribute the Licensed Series to Third Parties.**

"For a court to be able to construe a contract as a matter of law, the contract must be unambiguous." *Dynamic Pub. & Distrib. L.L.C. v. Unitec Indus. Ctr. Prop. Owners Ass'n, Inc*., 167 S.W.3d 341, 345 (Tex. App. 2005). "Whether an instrument is ambiguous is a question of law that must be decided by reviewing the covenant as a whole in light of the circumstances present when the covenant was entered." *Id.* "[I]f the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, which creates a fact issue on the parties' intent. *Id.*

Ordinarily, summary judgment is not proper where the contract is ambiguous because "interpretation of ambiguous contracts is a question for the jury." *Id*. However, "[t]he court may construe as a matter of law an ambiguous contract by considering undisputed evidence of the parties' intent. If there is a conflict in the parol evidence, the question of the parties' intent becomes one of fact, appropriate for consideration by the jury." Corley v. Entergy Corp., 246 F. Supp. 2d 565, 574 (E.D. Tex. 2003) (citing *Trinity Universal Ins. Co. v. Ponsford Bros*., 423 S.W.2d 571, 575 (Tex. 1968)). No such conflict exists in the parol evidence; as such, the language under the 2019 Agreement and 2021 Agreement controls.

The plain and unambiguous language under the 2019 Agreement gave the Olympusat Defendants the right to redistribute the English-dubbed versions of the Licensed Series under the definition of "Licensed Networks." See Exhibit 1, Sham Dep. at 94:18–96:8; see also Ans. Affirm. Def., Doc. 69 at ¶22. The term "Licensed Networks" is defined as follows:

> <u>Licensed Network</u>: Any owned, operated, or affiliated network or product offering of a Licensee, which shall be understood to include VOD and a la carte program

> offerings, which "affiliated" defined as any network or product offering, which is under common control or management, whether in whole or in part, of Licensee.

Based on this definition, Olympus's Corporate Representative, Colleen Glynn, Esq., clarified that the Licensed Series was a product offering to Olympusat that could be redistributed to third parties. Under the plain and unambiguous terms of the 2019 Agreement, the Olympusat Defendants had the rights to redistribute the English and Spanish dubbed and subtitled versions of the Licensed Series to third parties, including Pluto Inc., Tubi, Inc., and Canela Media, Inc. *See* Exhibit 2, Glynn Dep. at 91:5–13. As such, the Olympusat Defendants did not breach the redistribution rights under the 2019 Agreement.

Similarly, under the 2021 Agreement, the plain and unambiguous term "Licensed Networks" is defined as follows:

> <u>Licensed Network</u>: Any owned, operated, or affiliated network or product offering of a Licensee, which shall be understood to include VOD and a la carte program offerings, with "affiliated" defined as any network or product offering, or network partnered, collaborating or otherwise associated with the Licensee or any of its affiliated companies.

The rights to English, Spanish, and Portuguese remained the same. *See* Glynn Dep. at 112:1–5. In addition, an Amendment to the 2021 Agreement modified the language rights and replaced them with Spanish-dubbed versions. *See* Exhibit 2, Glynn Dep. at 112:7–11.

The Amendment provided that English-dubbed versions should be used on "Licensed Networks" only and for redistribution to third-parties. *Id.* Under the 2021 Agreement, "The Wolf" was considered a product offering to Olympusat. *See* Exhibit 2, Glynn Dep. at 114:23–115:15. Under the plain and unambiguous terms of the 2021 Agreement, the Olympusat Defendants had the rights to redistribute the English and Spanish dubbed and subtitled versions of the Licensed Series to third parties, including Pluto Inc., Tubi, Inc., and Canela Media, Inc. *Id.*

Additionally, the 2019 Agreement and 2021 Agreement contained integration clauses reciting that the Agreement(s) is the entire agreement between the parties. (cite). "A merger or integration clause is a contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract." *Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 53 n.1 (Fla. 1st DCA 2005) (citation and quotation marks omitted). The existence of a merger clause does not per se

establish the total integration of the agreement, but it is "a highly persuasive statement that the parties intended the agreement to be totally integrated . . ." *Id.* at 53. This is because the integration concept "is based on a presumption that the parties to a written contract intended that writing be the sole expositor of their agreement.*" Id.* (internal quotation marks and citation omitted). "Terms of a valid, integrated, written contract can be varied by extrinsic evidence only to the extent that the terms are ambiguous and are given meaning by the extrinsic evidence." *Avis Rent A Car Sys., Inc. v. Monroe Cnty.*, 660 So. 2d 413, 414 (Fla. 3d DCA 1995).

It is also important to note that both agreements include a "Right to Independent Counsel," provision advising each party to retain independent counsel to review the 2019 Agreement and 2021 Agreement. At deposition, however, Sham admitted that he did not speak to or discuss the 2019 or 2021 Agreement with a U.S. Attorney before executing the Agreement. *See* Sham Dep. at 84:3–6; 94:8–10 (testifying that Olympusat Defendants are not authorized to redistribute the Licensed Series under the 2019 Agreement). Thus, Sham appears to misunderstand the rights Plaintiff gave to the Olympusat under the 2019 Agreement and 2021 Agreements, despite the clear and ambiguous redistribution rights provided in each of the Agreements.

### B.   The Undisputed Facts Support That Defendants Did Not Distribute the Licensed Series Outside of the Licensed Territories.

As discussed above, the Olympusat Defendants implemented geo-filtering technology to restrict media content from being displayed outside the Licensed Territories in compliance with the parties' 2019 Agreement and 2021 Agreement. *See* Exhibit 2, Glynn Dep. at 56:3–9; Exhibit 3, Gildart Decl. at ¶8; Exhibit 4, Mohler Dep. at ¶¶ 7–8; Exhibit 5, at Arenas Decl. at ¶¶ 9–10.

The Defendants' experts cast serious doubt about the authenticity of the video evidence, showing that the License Series was based on missing metadata and cloud-based forensics performed on the videos. *See* Exhibit 3, Gildart Decl. at ¶¶10–19. If the Licensed Series was accessed outside the Licensed Territories, it was likely because the content was being accessed using a mechanism to mask the location of a particular IP address. *See* Exhibit 3, Gildart Decl. at ¶¶10–19. Simply put, the video evidence relied upon is inconsistent and not credible based on the forensics and metadata as outlined in Gildart and Frankovitz's expert report. *See* Exhibit 3, Gildart Decl. at ¶¶10–19. Thus, given the absence of evidence to support Plaintiff's breach of contract claims, Defendants distributed the Licensed Series outside the Licensed Territories. Thus, Defendants are entitled to summary judgment as to count III.

**WHEREFORE**, Defendants, OLYMPUSAT HOLDINGS, INC., a Florida corporation; OLYMPUSAT, LLC, a Florida limited liability company; OLYMPUSAT, INC., a Florida corporation; THOMAS MOHLER, an individual; OCEAN NEW MEDIA, LLC, a Florida limited liability company; under Fed. R. Civ. P. 56, respectfully requests the entry of an order (i) granting summary judgment in favor of Defendants as to counts I–III of the Second Amended Complaint; (ii) granting leave for Defendants to file a motion for attorneys' fees and costs under counts I–II under the Copyright Act, 17 U.S.C. § 505, *et. seq.*; (iii) sanctions for defendants' filing the instant motion as to plaintiff's claims; and (iv) any such further relief as the court deems just and proper.

DATED this 9th day of December, 2024.

**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP.**

By:  */s/ Leia V. Leitner*
Leia V. Leitner, Esq.
Florida Bar No: 0105621
111 N. Orange Avenue, Suite 1200
Orlando, Florida 32801
Telephone: 407-423-7287
Fax:          407-648-1376
Leia.leitner@wilsonelser.com
Alejandra.Boscan@wilsonelser.com

Jura C. Zibas, Esq.
Florida Bar No.: 124571
2063 Main Street - Suite 100
Sarasota, FL  34237
Telephone: 941-866-8561
Fax:          941-210-5979
Jura.Zibas@wilsonelser.com
Cheryl.Kujawski@wilsonelser.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 9, 2024, I filed the foregoing document with the Clerk of the Court via CM/ECF and the CM/ECF system, which will send a notice of electronic filing to all counsel and parties of record.

*/s/ Leia V. Leitner*
Leia V. Leitner